**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DEMETRIUS WILSON,**                              **CASE NO. 2:07-cv-511**
                                                   **JUDGE GRAHAM**
             **Petitioner,**                       **MAGISTRATE JUDGE ABEL**

**v.**

**MICHAEL SHEETS, Warden,**

             **Respondent.**

<u>**REPORT AND RECOMMENDATION**</u>

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant

to 28 U.S.C. §2254. This matter is before the Court on the instant petition, respondent's Return of

Writ, petitioner's traverse, and the exhibits of the parties. For the reasons that follow, the Magistrate

Judge **RECOMMENDS** that this action be **DISMISSED**.

**OVERVIEW**

A jury convicted Demetrius Wilson of two counts of murder with firearm specifications and

two counts of attempted murder with firearm specifications. The petition alleges that Wilson was

denied the effective assistance of counsel because his attorneys knew that one of the alleged

victims–Leonel Saucedo–had gunshot residue on his hands but completely overlooked that

information. Further, the attorneys failed to have blood as the murder scene tested for DNA.

Finally, the petition alleges that the evidence was insufficient to support the convictions and that

Wilson should not have been sentenced to consecutive prison terms.

**PROCEDURAL HISTORY**

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of

this case as follows:

> The Franklin County Grand Jury indicted appellant on two counts of aggravated murder with death penalty and firearm specifications, in violation of R.C. 2903.01, 2929.04(A)(5), 2941.145, and 2941.141. The grand jury also indicted appellant on two counts of attempted aggravated murder with firearm specifications, in violation of R.C. 2903.01, 2923.02, 2941.145, and 2941.141. Lastly, the grand jury indicted appellant on one count of having a weapon while under a disability, in violation of R.C. 2923.13.

> The above charges pertain to a September 21, 2003 shooting. Specifically, the aggravated murder charges stem from appellant fatally shooting Fortino Guzman-Gutierrez ("Guzman") and Jose Isabel Sandoval-Zarko ("Zarko"), and the attempted aggravated murder charges pertain to appellant shooting Leonel Saucedo and Rashaad Marshall.

> Appellant pled not guilty and elected to have a bench trial on the weapons under disability charge and a jury trial on the remaining charges. At trial, Clinton Township Police Sergeant Phillip Perry testified as follows on behalf of plaintiff-appellee, the State of Ohio. On the evening of September 21, 2003, the Franklin County Sheriff's Office dispatched Sergeant Perry to Dreamer's Lounge, and Sergeant Perry found Marshall outside the bar. Marshall was frightened and had a wound to his left forearm and in his chest area. Marshall told Sergeant Perry that a Hispanic male shot him.

> Officer Denny Blust worked for the Mifflin Township Police Department on September 21, 2003, and testified as follows on appellee's behalf. Officer Blust investigated the area where the shooting involving Marshall occurred. Blust saw that someone had fatally shot Guzman, and someone shot Zarko in the back. Zarko was alive at the time, and medics transported him to the hospital. Blust noted at trial that, although the crime scene was not well-lit on the evening of September 21, 2003, it was "not as dark as in going in a cave where you cannot see your hands in front of your face[.]" (Tr. at 141.)

> Next, Allison Gamble testified as follows on appellee's behalf. On September 21, 2003, Gamble lived in an apartment near where the above noted shooting took place. On the evening of September 21, 2003, Gamble drank alcohol and smoked marijuana with individuals

2

that included appellant, Marshall, Franklin Watkins, and Harold Warner. Gamble did not remember if appellant's brother was also present.

That evening, appellant talked about robbing Mexicans. Appellant also had a firearm in his pants waistband. In the course of events, appellant, Marshall, Watkins, and Warner left the apartment, and Gamble stayed at the apartment. Twenty minutes later, Gamble heard six to seven gunshots.

Franklin County Sheriff Detective Mike Kirkpatrick testified for appellee that he spoke with Marshall at the hospital during the early morning hours of September 22, 2003. According to Detective Kirkpatrick, Marshall stated that he did not shoot anyone and that a Hispanic male shot him. The detective further testified that he took evidence from Marshall's hands for gunshot residue testing.

Franklin Watkins testified to the following on appellee's behalf. On the evening of September 21, 2003, Watkins socialized at Gamble's apartment with individuals including Gamble, Warner, Marshall, appellant, and appellant's brother. Subsequently, Watkins walked with Warner, Marshall, appellant, and appellant's brother to a nearby store. On the way to the store, Marshall told the group that Watkins "told on him" for stealing a video game machine. (Tr. at 236.) Appellant stated that he "would kill anyone who would snitch on him." (Tr. at 237.)

Thereafter, when the group returned to the apartment, appellant and Marshall talked about robbing Mexicans that lived nearby. Marshall had a firearm earlier that evening, but appellant had that same firearm in his pants waistband while talking about the robbery. Afterward, Marshall, appellant, appellant's brother, and a "tall guy" went toward the area where the Mexicans lived. (Tr. at 245.) Warner joined the group later, and Watkins eventually joined them. When Watkins joined the group, he and Warner discussed robbing a pizza delivery person. While Watkins called to order the pizza, he heard two gunshots and started to run away. Watkins heard six or seven more gunshots when he ran across the street. Watkins then saw appellant running toward him, and appellant had the firearm.

Next, Saucedo testified to the following on appellee's behalf. On September 21, 2003, Saucedo socialized with Zarko and Guzman

3

outside an apartment complex. Two black men approached, and one of them asked for beer. Saucedo gave the man two beers and then continued to talk with his friends. Thereafter, the man who asked for the beer grabbed Guzman, put a firearm to his head, and shot him. Instantly, the man then shot Zarko and Saucedo. The bullet grazed the left side of Saucedo's chest.

Subsequently, law enforcement spoke with Saucedo about the shooting and asked Saucedo to identify the shooter in a photo array. Saucedo identified appellant as the shooter.

On direct-examination, Saucedo testified that the location of the shooting was not well-lit and that he remembered the shooter's face "a little bit." (Tr. at 305.) Likewise, Saucedo conceded on cross-examination that he did not see the shooter's face clearly and that the "black men" in the photo array "appear[ed] to be a little bit similar." (Tr. at 342.)

Warner testified to the following on appellee's behalf. Warner socialized with individuals that included Gamble, Watkins, Marshall, appellant, and appellant's brother during the evening of September 21, 2003. At some point that evening, Warner, Marshall, Watkins, and appellant walked to a nearby store. While walking to the store, Marshall mentioned that Watkins "told on him" for stealing a video game machine. Appellant responded: " 'I don't want nobody snitching on me[.]" ' (Tr. at 363.)

Subsequently, appellant and Marshall started talking about robbing Mexicans who lived nearby. The group walked toward the area where the Mexicans lived. Appellant then pointed a firearm at a Mexican woman holding a baby and stated: " 'I could pop her like from here."' (Tr. at 368.)

Meanwhile, Warner decided that the group should rob a pizza delivery person instead. Watkins used his cell phone to order pizza. Appellant and Marshall walked away and, thereafter, Warner heard gunshots. Warner then saw appellant shooting a firearm, although Warner did not see whom appellant was shooting. Warner and Watkins started to run, and appellant, carrying the firearm, ran toward them and stated: " 'I shot the mother fucker." ' (Tr. at 376.)

4

Afterwards, Franklin County Sheriff Detective Chris Floyd spoke with Warner about the shooting. Warner provided information to Detective Floyd, and the detective later gave money to Warner. However, the money did not influence Warner's testimony. Lastly, Warner testified that he was a closer friend with Marshall than appellant, and Warner admitted that he was previously charged with falsification, but pled to a misdemeanor disorderly conduct under a plea bargain.

Marshall testified to the following on appellee's behalf. Marshall was socializing with individuals including appellant, Gamble, Watkins, and Warner on the evening of September 21, 2003. Marshall never had a firearm that evening, but appellant did.

During the evening, Marshall, Warner, Watkins, and appellant walked to a nearby store. On the way to the store, Marshall confronted Watkins about Watkins revealing that Marshall stole a video game machine. Appellant "said that if somebody snitched on him he felt that he would kill them." (Tr. at 439.) Marshall thought that appellant was joking.

Afterwards, the group returned to Gamble's apartment complex, and the group talked about robbing a pizza delivery person. Meanwhile, appellant and Marshall left the group and approached some Mexicans that lived nearby. Marshall asked one of the Mexicans for a beer. The Mexican, Guzman, gave Marshall a beer and appellant grabbed Guzman and shot him in the head. Marshall did not expect this to happen, stating: "As far as I know it was robbing the pizza place, and when [appellant] told me to walk with him[,] I walked with him." (Tr. at 456.) Next, appellant turned toward Marshall and pointed the firearm toward Marshall. Marshall tried to grab the firearm, but appellant shot Marshall. Marshall fled and heard six to seven more shots. Marshall went to Dreamer's Lounge to ask for help because he was bleeding and could not breathe.

Ultimately, medics transported Marshall to the hospital. At the hospital, a law enforcement officer took samples from Marshall's hands for a gunshot residue test. Marshall had not washed his hands between the time that he was at Dreamer's Lounge and the time that law enforcement took the gunshot residue samples.

5

On direct examination, Marshall admitted that he first told law enforcement that a Mexican shot him, and that he lied when he made that statement. Marshall further noted that he later falsely told law enforcement that an "unknown subject approached" him and shot him. (Tr. at 426.) Likewise, Marshall admitted to also telling law enforcement that a drug dealer named "G" shot him, and that he again lied when he made that statement. (Tr. at 426.) However, Marshall verified that he ultimately told law enforcement the truth, which was that appellant shot him.

In addition, on direct examination, Marshall testified that appellee charged him with three counts of felony obstruction of justice because of his failure to initially tell the truth about the shooting. Marshall acknowledged that appellee allowed him to plead to one count of obstruction of justice with the possibility of community control in exchange for him testifying against appellant. Likewise, Marshall noted that he was convicted of aggravated robbery and aggravated burglary in 2001.

On cross-examination, Marshall acknowledged that he previously told Warner that appellant was not trying to shoot him, but was trying to protect his life. Marshall also stated on cross-examination that he gave different accounts of the incident because he was scared "for [his] life" due to appellant's actions. (Tr. at 487.)

Ohio Bureau of Identification and Investigation Forensic Scientist Martin Lewis testified on behalf of appellee that he examined the gunshot residue test samples that law enforcement took from Marshall's hands. Lewis stated that he found no gunshot residue from the samples.

Detective Floyd investigated the September 21, 2003 shooting incident and testified as follows on appellee's behalf. First, Detective Floyd learned that Guzman was dead at the crime scene and that Zarko died at the hospital. Next, Detective Floyd spoke with Marshall about the incident, and Marshall originally indicated that a light-skinned man, either black or Hispanic, shot him. Thereafter, Marshall indicated that a man nicknamed "G" shot him. (Tr. at 647.) Ultimately, Marshall confessed that appellant was the shooter. Detective Floyd then asked Marshall to identify appellant in a photo array, but Marshall refused, stating that he was afraid for his family.

6

Marshall also asked what Detective Floyd was "going to do for him[.]" (Tr. at 655.) At a later time, Marshall identified appellant in the photo array.

Detective Floyd also talked with Saucedo about the incident. Saucedo identified appellant in a photo array as the shooter. Detective Floyd also showed Saucedo a photo array with Marshall's photograph, but Saucedo was unable to pick anyone out of that photo array. Likewise, Gamble, Watkins, and Warner spoke with Detective Floyd and provided information about appellant's identity and activities during the evening of September 21, 2003. Eventually, Detective Floyd issued a warrant for appellant's arrest, and appellant surrendered himself at the jail on October 20, 2003. Appellant had no gunshot wounds when he went to jail.

On direct examination, Detective Floyd verified that he gave Warner $20 after Warner provided information about appellant. Likewise, Detective Floyd indicated that his partner gave Gamble $50 after she provided information about appellant. The money came from the "[f]urther of justice fund, which is seized money." (Tr. at 666.)

Detective Floyd explained that he gave money to Warner because:

A. At the time of the interview [Warner] had some crisis in his life and he needed his driver's license or something like that and he was cooperative so it's not uncommon in cases like this to pay informants by buying them dinner or cigarettes or pop * * *.

(Tr. at 665-666.) Detective Floyd explained that his partner gave money to Gamble because "[w]e had disrupted [Gamble's] life at that time and she was cooperative[.]" (Tr. at 666.)

Next, Dr. Patrick Fardal from the Franklin County Coroner's Office testified on appellee's behalf that Zarko "died as a result of [a] gunshot wound to the trunk, injuries to the thoracic spinal cord and to the right lung and subsequent internal bleeding." (Tr. at 775.) Dr. Fardal testified that Guzman "died solely and exclusively as a result of suffering a contact gunshot wound to his head which was perforation of the skull and brain, along with a secondary gunshot wound to the trunk, which caused injuries to his left lung, and subsequently causing internal hemorrhaging[.]" (Tr. at 764-765.)

7

The jury found appellant not guilty of the aggravated murder charges, but guilty of the lesser-included offenses of murder in regards to the death of Guzman and Zarko. The jury also found appellant not guilty of the attempted aggravated murder charges, but guilty of the lesser-included offenses of attempted murder in regards to the shooting of Saucedo and Marshall. In addition, the jury found appellant guilty on all accompanying firearm specifications. Appellee dismissed the weapon under disability charge.

At the sentencing hearing, appellant's defense counsel noted that appellant "has no adult record of any significance[.]" (Tr. at 815.) Appellant also mentioned during the sentencing hearing that "the person who did these * * * is still out there[.]" (Tr. at 816.) Thereafter, the trial court sentenced appellant to 15 years to life imprisonment on each of the murder convictions and nine years imprisonment on each of the attempted murder convictions. The trial court merged the firearm specifications and sentenced appellant to three years imprisonment on the merged specifications. The trial court ordered appellant to serve each prison term consecutively.

In imposing the sentence, the trial court stated:

The one victim was Mr. Guzman, and Mr. Guzman had this gun placed in the back of his head and was shot point blank and was killed instantly.

Mr. Zarko was shot in the back severing his spine and he was taken to the hospital and he died at the hospital.

There were two other gentlemen there that were shot, Mr. Marshall was shot in the left arm and Mr. Saucedo was shot in the torso area.

* * *

Now, the court makes a finding that the consecutive sentences are worth it and necessary to protect the public and to punish you, the offender; and the murders the court finds are the worst kind of offenses and the court makes that finding, and the court also makes

8

a finding that these sentences are consecutive sentences and are not disproportionate to your conduct and to the danger imposed by you, the defendant.

Now, the court further makes a finding, because of the age of this offender, and it is likely that this offender will commit similar offenses in the future, the court further finds that the sentence imposed and the consecutive sentences imposed do not demean the seriousness of the offenses, and the court finds that it is appropriate to impose the consecutive sentences because of the nature of the offenses committed, and the court underscores the fact that the offenses committed are not disproportionate to the conduct that was imposed by this defendant.

* * *

* * * Now, relative to consecutive sentencing, I set forth in my findings relative to those matters to consecutive sentences and I do wish to place on the record that the court has made a finding that the harm imposed relative to these offenses so great, so unusual that there could be no single term; and that's the reason the court imposed consecutive sentences. No single term could adequately reflect the seriousness of your conduct, and the court imposed consecutive sentences having made that finding.

(Tr. at 817-819, 821.)

*State v. Wilson*, 2006 WL 328689 (Ohio App. 10 Dist. February 14, 2006). Represented by new counsel, petitioner filed a timely appeal. He raised the following assignments of error:

I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF MURDER AND ATTEMPTED MURDER AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

II. THE TRIAL COURT ERRED TO THE PREJUDICE OF

9

APPELLANT BY IMPROPERLY SENTENCING HIM TO CONSECUTIVE TERMS OF ACTUAL INCARCERATION IN CONTRAVENTION OF OHIO'S SENTENCING STATUTES.

III. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY IMPROPERLY SENTENCING HIM TO TERMS OF ACTUAL INCARCERATION WHICH WERE LONGER THAN THE MINIMUM TERMS IN CONTRAVENTION OF OHIO'S SENTENCING STATUTES.

*See id.* On February 14, 2006, the appellate court sustained petitioner's third assignment of error and remanded the case to the trial court for re-sentencing, but otherwise affirmed the trial court's judgment. Id. Petitioner filed a timely appeal to the Ohio Supreme Court. On June 6, 2006, the Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question. *State v. Wilson*, 109 Ohio St.1497 (Ohio 2006); *Exhibit 17 to Return of Writ*. On February 22, 2007, the trial court re-sentenced petitioner to the same sentence. *Exhibit 21 to Return of Writ*. Represented by new counsel, petitioner filed a timely appeal. He raised the following assignment of error:

> The trial court erred in sentencing appellant to a non-minimum prison sentence for attempted murder in violation of the due process and ex post facto clauses of the United States Constitution.

*Exhibit 23 to Return of Writ*. On September 18, 2007, the appellate court denied petitioner's appeal. *State v. Wilson*, 2007 WL 2702847 (Ohio App. 10 Dist. September 18, 2007). On January 23, 2008, the Ohio Supreme Court dismissed petitioner's subsequent appeal. *State v. Wilson*, 116 Ohio St.3d 1480 (Ohio 2008).

Meanwhile, on May 1, 2006, petitioner filed an application to reopen his appeal pursuant to Ohio Appellate Rule 26(B). He raised the following assignments of error:

> 1. Appell[ant] was denied effective assistance of trial counsel when counsel failed to adequately investigate and prepare the case by not

10

having evidence D.N.A. tested that would prove that someone other than appellant committed the crimes.

2. Appell[ant] has been denied the right to [a] fair trial through the cumulative effect of errors that have occurred in this case.

*Exhibit 18 to Return of Writ*. On October 17, 2006, the appellate court denied petitioner's Rule 26(B) application. *Exhibit 20 to Return of Writ*. Petitioner apparently never filed an appeal to the Ohio Supreme Court.

On June 11, 2007, petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. He alleges that he is in the custody of respondent in violation of the Constitution of the United States based upon the following grounds:

1. Ineffective assistance of trial counsel.

Trial attorneys Ron James and Joe Edwards were given records showing that one of the State's witnesses (Leonel Saucedo) had gunshot residue on his hands the night of the incident and this information was completely overlooked. During trial outside the presence of the jury, trial counsel claimed that the prosecution did not inform them about this information which was not true. Trial counsel also failed to have evidence D.N.A. tested. During trial State's witness Leonel Saucedo stated that the black man he gave a beer to had on a black coat and that same man with the black coat who he gave the beer to grabbed his friend and shot him in the [illegible] area. The black coat Mr. Leonel seen [sic] was Rashaad Marshals and it was not tested to see if his friend's blood was there.

2. Denied the right to a fair trial through the cumulative effect of errors.

If trial counsel would have thoroughly went thr[ough] the motion of the discovery they would have seen the information proving that Leonel Saucedo had gunshot residue on his hands proving that he fired a gun that night. Trial counsels were not prepared at all to impeach Mr. Leonel for having G.S.R. on his hands. Also trial counsels were not being professional by ignoring evidence covered in blood and not having it tested. If these errors were not ma[de] the outcome of the trial could have been different.

11

      3.  Insufficient evidence.

      4.  Improper sentence to consecutive terms.

It is the position of the respondent that claims one and two are procedurally defaulted and that claims three and four are without merit.

## PROCEDURAL DEFAULT

Respondent argues that Grounds 1 and 2 of the petition–that Wilson was denied the effective assistance of counsel at trial–are procedurally barred because those claims were not raised on direct appeal.  Further, although Wilson did file a Rule 26(B) motion to reopen his direct appeal to allege ineffective assistance of appellate counsel for failure to assign as error the ineffective assistance of trial counsel, he failed to appeal the Ohio Court of Appeals' decision denying the motion to reopen to the Supreme Court of Ohio.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration.  28 U.S.C. §2254(b), (c).  If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies.  *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982) *(per curiam)*; *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).  If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error.  *Murray v. Carrier*, 447 U.S. 478, 485 (1986); *Engle v. Issac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level. *Leroy v. Marshall,* 757 F.2d 94 (6th Cir. 1985).

In claims one and two, petitioner appears to assert the ineffective assistance of trial counsel due to his attorney's failure to properly investigate and prepare for trial. Specifically, petitioner contends that his attorneys overlooked evidence provided in discovery indicating that prosecution witness Leonel Saucedo had gunshot residue on his hands which would have established that it was Saucedo, and not petitioner, who shot Marshall, and that counsel also failed to test a blood soaked black coat worn by prosecution witness Rashaad Marshall for DNA evidence which would have exonerated petitioner as the shooter of Fortino Guzman-Gutierrez. *See Traverse*. He also appears to assert the ineffective assistance of appellate counsel for failing to raise these same claims on direct appeal. *See id.*

13

To the extent that petitioner's claim of ineffective assistance of trial counsel relies on evidence readily apparent from the face of the record, such claim should have been raised on direct appeal, but was not.  Further, petitioner may now no longer present such claim to the state courts under Ohio's doctrine of *res judicata.*   *See State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175 (1967).

To the extent that petitioner's claim of ineffective assistance of trial counsel may rely on evidence not readily apparent from the face of the record, such claim would properly be raised in a petition for post conviction relief pursuant to O.R.C. §2953.21; however, the time period for filing such action has long since expired.[1] Petitioner may pursue a delayed post conviction petition, pursuant to O.R.C. §2953.23, which provides:

> (A) Whether a hearing is or is not held on a petition filed pursuant to section 2953.21 of the Revised Code, a court may not entertain a

___

[1]  O.R.C. §2953.21 provides in relevant part:

(A)(1) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of his rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.

(2) A petition under division (A)(1) of this section shall be filed no later than one hundred eighty days after the date on which the trial transcript is filed in the court of appeals in the direct appeal of the judgment of conviction or adjudication or the date on which the trial transcript is filed in the supreme court if the direct appeal involves a sentence of death. If no appeal is taken, the petition shall be filed no later than one hundred eighty days after the expiration of the time for filing the appeal.

petition filed after the expiration of the period prescribed in division (A) of that section or a second petition or successive petitions for similar relief on behalf of a petitioner unless both of the following apply:

(1) Either of the following applies:

(a) The petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief.

(b) Subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.

(2) The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.

However, the record fails to reflect that petitioner can meet this standard here.

Petitioner properly raised his claim of ineffective assistance of appellate counsel in his Rule 26(B) application; however, he failed to file a timely appeal of the appellate court's October 17, 2006, denial of his Rule 26(B) application, and Ohio does not permit delayed appeals in Rule 26(B) proceedings. Ohio Supreme Court Rule of Practice II, Section 2(A)(4)(c).

The state courts were never given an opportunity to enforce the foregoing procedural rules due to the nature of petitioner's procedural defaults. This Court deems the first and second parts of the *Maupin* test to have been satisfied.

This Court must also decide whether the procedural rules at issue constitute an adequate and independent bases upon which to foreclose review of petitioner's federal constitutional claims. This

15

task requires the Court to balance the state's interests behind each procedural rule against the federal interest in reviewing federal claims. *See Maupin v. Smith*, 785 F.2d at 138. Under this analysis, the procedural rules barring claims one and two constitute adequate and independent state grounds for denying relief. The state courts must be given a full and fair opportunity to remedy alleged constitutional defects. The requirement that all available claims be presented at the first opportunity and the time limits for filing post conviction proceedings and an appeal to the Ohio Supreme Court in Rule 26(B) proceedings serves the state's interests in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. Further, the doctrine of *res judicata* is stated in unmistakable terms in numerous Ohio decisions and Ohio courts have consistently refused to review claims on the merits under that doctrine. *See State v. Cole*, *supra; State v. Ishmail, supra; State v. Perry, supra*.

Petitioner has waived his right to present claims one and two for federal habeas review. He can still secure review of these claims on the merits if he demonstrates cause for his failure to follow the state procedural rules as well as actual prejudice from the constitutional violations that he alleges. The Court presumes that petitioner asserts the ineffective assistance of appellate counsel as procedural default for his on-the-record claim of ineffective assistance of trial counsel.

The ineffective assistance of counsel may constitute cause for a procedural default, so long as such claim has been presented to the state courts and is not itself procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). Here, however, petitioner procedurally defaulted his ineffective assistance of appellate counsel claim by failing to file a timely appeal of the appellate court's decision denying such claim to the Ohio Supreme Court.

As cause for this procedural default, petitioner asserts that he was incarcerated at the Franklin

County Jail from May 31, 2006, until January 23, 2007, waiting to be re-sentenced, and that he did not know about the appellate court's October 17, 2006, denial of his Rule 26(B) application. Petitioner further asserts that, "assuming... [he] did know that the Court of Appeals denied his application he lacked legal materials and access to a law library" until he was returned to the Ross Correctional Institution, and after the time to file an appeal had already expired. *See Traverse*. In support of this allegation, petitioner has attached a letter dated September 12, 2007, from attorney Thomas Hayes, with attached records purportedly from the Franklin County Sheriff's Office which appear to indicate that he was incarcerated. *See Exhibits to Traverse*.

"[P]etitioner has the burden of showing cause and prejudice to overcome a procedural default." *Hinkle v. Randle,* 271 F.3d 239, 245 (6th Cir. 2001), citing *Lucas v. O'Dea,* 179 F.3d 412, 418 (6th Cir. 1999)(internal citation omitted).

> '[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman v. Thompson,* 501 U.S. 722, 753 (1991).

*Maples v. Stegall,* 340 F.3d 433, 438 (6th Cir. 2003); *see also Lundgren v. Mitchell*, 440 F.3d 754, 763-64 (6th Cir. 2006), citing *Murray v. Carrier,* 477 U.S. 478, 488 (1986). Petitioner's *pro* se status, or "ignorance of the law and procedural requirements for filing a notice of appeal is insufficient to establish cause to excuse his procedural default." *Bonilla v. Hurley,* 370 F.3d 494, 498 (6th Cir. 2004), citing *Hannah v. Conley,* 49 F.3d 1193, 1197 (6 th Cir. 1995). To establish cause, petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him." *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir. 2007), citing *Jamison v. Collins,* 291 F.3d 380, 386 (6th Cir. 2002) (holding that the prosecution's withholding of *Brady* evidence qualified as a

"substantial reason for the default that is external to [the petitioner]"). *See, e.g., Maples v. Stegall*, *supra*, 340 F.3d at 438-39 (failure by prison officials to promptly deliver legal mail may constitute cause for procedural default); *but see Martin v. Vannatta*, unpublished, 145 Fed.Appx 45 (7th Cir. May 23, 2006)(rejecting petitioner's assertion that inadequate funds for postage constituted cause for his untimely filing where he could have obtained free postage.)

This Court is not persuaded by petitioner's argument. Nothing in the record reflects that petitioner would have been unable to keep advised of, or made any effort to learn about the status of his Rule 26(B) application. *See, e.g., Dunigan v. Parker*, 2008 WL 183230 (.D. Tenn. January 17, 2008)(equitable tolling of the statute of limitations not appropriate where petitioner offered no explanation as to why he failed to contact the appellate court to determine the status of his appeal); *Bourne v. Carlton*, 2006 WL 1491196 (E.D. Tenn. May 30, 2006)(same):

> Though some twenty-three months had passed since the filing date and though the petitioner had received no notice as to the disposition of his case, he appears to have "passively awaited" the decision and to have made no attempt to stay informed as to the status of his application. See *Alaska Limestone Corp. v. Hodel*, 799 F.2d 1409, 1412 (9th Cir.1986) ("A party has an independent duty to keep informed [as to his status of his case.]"). The petitioner did not act reasonably in this respect and, thus, has not demonstrated due diligence in protecting his rights. *See, e.g., Plowden v. Romine*, 78 F.Supp.2d 115, 116-20 (E.D.N.Y.1999) (no equitable tolling where petitioner did not ask appellate court or attorney about status of leave to appeal for 17 months).

*Bourne v. Carlton, supra.*

Further, even assuming that petitioner can establish cause for his procedural default, he cannot establish prejudice, as the record reflects that his ineffective assistance of appellate counsel claim is without merit. The state appellate court rejected this claim as follows:

In *Wilson*, this court affirmed appellant's convictions and sentences for two counts of murder, two counts of attempted murder and accompanying firearm specifications. *Id*. at ¶64. Appellant's murder convictions pertain to appellant fatally shooting Fortino Guzman-Gutierrez and Jose Isabel Sandoval-Zarko. *Id*. at ¶3, 31. Appellant's attempted murder convictions pertain to appellant shooting, but not killing, Leonel Saucedo and Rashaad Marshall. *Id*. at ¶3, 31.

\*\*\*

Here, appellant first asserts that his appellate counsel rendered ineffective assistance by not challenging his trial counsels' failure to make preparations "to impeach \*\*\* Saucedo for having gun shot residue on his hand, to prove that he was the man who shot \*\*\* Marshall[.]" However, contrary to appellant's assertions, through forensic scientist Martin Lewis' testimony, both appellee and appellant's trial counsel admitted into evidence that scientific testing revealed that "particles highly indicative of gunshot primer residue [were] identified on the 'left hand' sample" from Saucedo. (Tr. at 613.) Likewise, we note that appellant incorrectly states that his trial counsel falsely represented to the trial court that appellee failed to provide discovery about the gunshot residue. Contrary to appellant's assertions, trial counsel acknowledged to the trial court that appellee provided discovery about Saucedo having gunshot residue on his hand. Rather, trial counsel complained that the discovery did not provide other details to which Lewis testified, i.e., that gunshot residue testing is based on a point system between one through ten and that Saucedo had two particles indicative of gunshot residue on his left hand. In response to trial counsels' concerns, the trial court allowed them to privately speak with Lewis so that they would "feel that [they] have sufficient information we determine that appellant's trial counsel did not render ineffective assistance in regards to the issue of gunshot residue on Saucedo's left hand. Thus, we conclude that appellant's argument lacks merit and, therefore, appellate counsel was not required to raise it.... As such, we find that appellate counsel did not render ineffective assistance by not raising appellant's above noted issue concerning the gunshot residue on Saucedo's hand....

Next, appellant argues that his appellate counsel rendered ineffective assistance by not challenging trial counsels' failure to test DNA evidence that appellant purports would have demonstrated that he did not commit the crimes for which he was convicted. However, appellant's contention necessitates reliance on evidence not in the record, i.e., the results of the DNA test and affidavits demonstrating

19

testimony about the test results. *See State v. Hartman* (2001), 93 Ohio St.3d 274, 298-299. Issues that require proof outside the record are not appropriate for direct appeal. *Id*. at 299. As such, it is well-established that appellate counsel is not required to argue issues that arise from facts outside the record. *State v. Williams*, Cuyahoga App. No. 82364, 2005-Ohio-2439, at ¶13. Accordingly, we conclude that appellate counsel did not render ineffective assistance by not challenging trial counsels' failure to test DNA evidence. *See Strickland* at 687; *McNeal* at ¶11-12.

Appellant further argues that appellate counsel rendered ineffective assistance by failing to assert that appellant "has been denied the right to [a] fair trial through the cumulative effect of errors that have occurred in this case." However, appellant makes no specific argument in support of such an assertion. "'Merely asserting error is not sufficient fo [an App.R. 26(B)] applicant to demonstrate that both counsel's performance was deficient and that the deficient performance prejudiced him.'" ....

*Exhibit 20 to Return of Writ*. Again, the decision of the state appellate court is presumed to be correct. 28 U.S.C. 2254(d), (e). Petitioner has failed to establish that the state appellate court's decision is unreasonable so as to warrant habeas corpus relief.

The right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

20

assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.,* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*., at 697. Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Strickland,* 466 U.S. at 697.

The *Strickland* test applies to appellate counsel. *Burger v. Kemp*, 483 U.S. 776 (1987). Defendants appealing their criminal convictions enjoy the same Sixth Amendment right to the effective assistance of counsel on a direct appeal as of right that they have during trial. While appellate counsel is not expected to raise every nonfrivolous issue on direct appeal, counsel is obligated to provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). As with an ineffective assistance of trial counsel claim, a petitioner must demonstrate that counsel's performance was deficient and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 696; *Sims v. Livesay*, 970 F.2d 1575, 1579-81 (6th Cir. 1992).

As noted by the state appellate court, nothing in the record reflects that DNA evidence would have exonerated petitioner or provided him with exculpatory evidence. Wilson argues in his response to the Return of Writ (doc. 11) that the DNA evidence might possibly show that Marshall, holding Guzman in a headlock as the victim testified, shot Guzman in the head and himself in the hand with the same bullet. However, there was no gunshot residue on Marshall's hands. Saucedo and Marshall

both testified that Wilson shot all four victims.  Gamble, Watkins, and Warner placed a gun in

Wilson's possession both immediately before and immediate after the killings.  No one testified that

Marshall had a gun at that time.  There is no reason to believe that DNA testing would have altered

the outcome of the trial.  Further, as discussed by the state appellate court, any DNA evidence would

have been off-the-record and properly raised in post conviction proceedings, not on direct appeal.

Therefore, petitioner has failed to establish the ineffective assistance of counsel under the two-prong

test of *Strickland*.  He likewise has failed to establish prejudice for his procedural defaults of claims

one and two.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an

extraordinary case, where a constitutional violation has probably resulted in the conviction of one

who is actually innocent."  *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S.

333.  After review of the record, the Court does not deem this to be such a case.

### CLAIM THREE

In claim three, petitioner asserts that the evidence was constitutionally insufficient to sustain

his convictions.  The state appellate court rejected this claim in relevant part as follows:

> In his first assignment of error, appellant first contends that his
> convictions are based on insufficient evidence. We disagree.
>
> Sufficiency of the evidence is a legal standard that tests whether the
> evidence introduced at trial is legally sufficient to support a verdict.
> *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541.
> We examine the evidence in the light most favorable to the state and
> conclude whether any rational trier of fact could have found that the
> state proved beyond a reasonable doubt the essential elements of the
> crime. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492,
> paragraph two of the syllabus, following *Jackson v. Virginia* (1979),
> 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; *State v. Yarbrough*, 95
> Ohio St.3d 227, 767 N.E.2d 216, 2002-Ohio-2126, at ¶ 78. We will
> not disturb the verdict unless we determine that reasonable minds

could not arrive at the conclusion reached by the trier of fact. *Jenks* at 273, 574 N.E.2d 492. In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. See *Jenks,* paragraph two of the syllabus; *Yarbrough* at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim); *State v. Lockhart* (Aug. 7, 2001), Franklin App. No. 00AP-1138.

We first address appellant's murder convictions that pertained to Guzman and Zarko's death. R.C. 2903.02(A) defines murder and states: "No person shall purposely cause the death of another[.]" An individual acts purposely when he or she has a "specific intention to cause a certain result [.]" R.C. 2901.22(A).

A jury may infer a purpose to cause death from a defendant inflicting a wound upon a person with a deadly weapon in a manner calculated to kill. *State v. Stallings* (2000), 89 Ohio St.3d 280, 291, 731 N.E.2d 159; *State v. Wilson* (Nov. 2, 2000), Franklin App. No. 99AP-1259. In making such an inference, the jury may consider the places where bullets entered the victim and the resulting wounds. *State v. Strodes* (1976), 48 Ohio St.2d 113, 116, 357 N.E.2d 375, death penalty vacated (1978), 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1154; *Wilson.*

Here, Saucedo and Marshall testified that appellant killed Guzman with a firearm, a deadly weapon. See R.C. 2923.11(B)(1). Appellant held the firearm to Guzman's head and the bullet perforated Guzman's brain, a vital organ. Such evidence allowed the jury to infer that appellant purposely killed Guzman. See *Stallings* at 291, 731 N.E.2d 159; *Strodes* at 116, 357 N.E.2d 375; *Wilson.* The jury also properly concluded that appellant purposely killed Zarko, given Saucedo's testimony that appellant instantly shot Zarko with a deadly weapon after killing Guzman, and given that Zarko sustained gunshot wounds to his vital organs, the lung and spinal cord. See *Stallings* at 291, 731 N.E.2d 159; *Strodes* at 116, 357 N.E.2d 375; *Wilson.* Lastly, appellant revealed his state of mind to commit the purposeful killings when, prior to the shootings, appellant pointed a firearm at a Mexican woman holding a baby and stated: " 'I could pop her * * * from here." ' (Tr. at 368.)

Next, we address appellant's attempted murder convictions that pertained to Saucedo and Marshall. The elements of attempted murder are a person purposely engaging in conduct that, if successful, would

23

cause another's death. R.C. 2923.02 and 2903.02; *State v. Kidder* (1987), 32 Ohio St.3d 279, 283, 513 N.E.2d 311.

Here, the jury properly inferred that appellant committed attempted murder against Marshall and Saucedo upon considering that appellant instantly shot them after appellant fatally wounded Guzman and Zarko, and upon considering Marshall's testimony that he actually pointed the firearm toward him before shooting him. Similarly, the jury could have properly inferred that, due to appellant's previous statement that he would kill anybody who "snitched" on him, appellant had a purpose to kill Saucedo and Marshall to silence them after appellant had just shot Guzman and Zarko.

Accordingly, based on the above, we conclude that there is sufficient evidence to support appellant's murder and attempted murder convictions. Next, appellant argues in his first assignment of error that his convictions are against the manifest weight of the evidence. Again, we disagree.

\*\*\*

Appellant first argues that his convictions are against the manifest weight of the evidence by claiming that Warner's and Marshall's testimonies are not credible. In challenging the credibility of Warner, appellant notes that Detective Floyd paid Warner money after Warner provided a witness statement. Further, appellant notes that Warner testified that he was a closer friend with Marshall than with appellant, and that Warner had been previously charged with falsification.

In challenging the testimony of Marshall, appellant asserts that Marshall previously gave several inconsistent accounts as to who committed the shootings. Appellant also emphasizes that appellee charged Marshall with three counts of obstruction of justice and that, in exchange for his testimony against appellant, appellee allowed Marshall to plead guilty to only one of those counts with the possibility of getting community control and avoiding prison.

Appellant further claims that his convictions are against the manifest weight of the evidence by arguing that Saucedo's testimony has little weight. As noted above, Saucedo testified that appellant shot him and fatally wounded Guzman and Zarko. However, appellant claims that Saucedo misidentified appellant as the shooter because Marshall testified that he asked for a beer before the shooting and that Saucedo testified that the man who asked for a beer was the shooter. In further

arguing that Saucedo misidentified appellant as the shooter, appellant highlights that Saucedo testified that the crime scene was not well-lit and that Saucedo claimed that he only remembered appellant's face "a little bit." (Tr. at 305.) Appellant also emphasizes that Saucedo conceded that he did not see the shooter's face clearly, and that he testified that the "black men" in the photo array with appellant "appear[ed] to be a little bit similar." (Tr. at 342.)

However, the jury did not lose its way in ultimately believing Saucedo's, Marshall's, and Warner's testimony that appellant was the shooter during the September 21, 2003 incident given that other witnesses testified that appellant had a firearm just before and after the shooting. In particular, Watkins saw appellant with the firearm shortly after he heard the gunshots. Likewise, the following evidence discounts appellant's assertion that Marshall, not appellant, was the shooter: (1) after the incident, law enforcement found no gunshot residue on Marshall's hands; (2) Marshall, not appellant, sustained gunshot injuries from the incident; and (3) Saucedo did not identify Marshall in a photo array that included Marshall's photograph.

In addition, Saucedo's testimony is not incredible just because the crime scene was not well-lit, because Officer Blust confirmed that there was some visibility in the area. Similarly, Warner's testimony is not incredible just because Detective Floyd paid Warner money, because Detective Floyd paid the money after Warner had already told the detective what had happened, and Warner confirmed that the money did not influence his testimony.

Lastly, we conclude that the jury had cause not to discount Marshall's testimony despite his different accounts of the incident and previous refusal to implicate appellant. Appellant announced before the incident that he would kill anyone who "snitched" on him. Although Marshall initially thought that appellant was joking when he made that statement, Marshall testified that he provided inconsistent accounts of the incident because he was scared for his life due to appellant's actions and, at one point, Marshall declined to identify appellant to Detective Floyd in a photo array because Marshall was afraid for his family.

Accordingly, we conclude that appellant's convictions are not against the manifest weight of the evidence. Having also concluded that appellant's convictions are not based on insufficient evidence, we overrule appellant's first assignment of error.

*State v. Wilson, supra*, 2006 WL 328689.

Petitioner's federal habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Harpster v. Ohio,* 128 F.3d 322, 326 (6th Cir.1997). Under 28 U.S.C. §2254(e)(1), the state court's factual findings are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

*Id.* Further, the state court's decision is binding on this Court unless that decision is contrary to or involves an unreasonable application of clearly established federal law as determined by the United States Supreme Court:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).

> A state court's determination is contrary to federal law when the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or on indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an unreasonable application of federal law when the state court correctly identified the applicable legal principle from Supreme Court precedent, but applied that

26

> principle to the facts before it in an unreasonable manner. *Id.* at 413,
> 120 S.Ct. 1495.

*Maldonado v. Wilson*, 416 F.3d 470, 475 (6th Cir. 2005).  Petitioner has failed to meet this standard here.

Petitioner's claim that his convictions are against the manifest weight of the evidence fails to present a claim appropriate for federal habeas corpus review.  The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without proof sufficient to allow a rational trier of fact to find guilt beyond a reasonable doubt.  *Walker v. Engle,* 703 F.2d 959, 969 (6th Cir.), *cert. denied,* 464 U.S. 962 (1983). In the context of a claim alleging a violation of due process, "sufficiency of the evidence" refers to the due process requirement that there be enough evidence introduced in favor of the prosecution for a rational trier of fact to find each element of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). In reviewing a sufficiency of the evidence claim, a federal habeas court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence and the credibility of the witnesses. *Jackson,* 443 U.S. at 319; *Walker,* 703 F.2d at 969.

However, under Ohio law, a claim that a verdict was against the manifest weight of the evidence-as opposed to one based upon insufficient evidence-requires the appellate court to act as a "thirteenth juror" and review the entire record, weigh the evidence and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983); *cf. Tibbs v. Florida,* 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Since a federal habeas court does not function as an additional state appellate

27

court, vested with the authority to conduct such an exhaustive review, petitioner's claim that his conviction was against the manifest weight of the evidence cannot be considered by this Court.

However, before a criminal defendant can be convicted consistent with the United States Constitution, there must be sufficient evidence to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia, supra,* 443 U.S. at 319. To determine whether the evidence was sufficient to support a conviction, this Court must view the evidence in the light most favorable to the prosecution. *Wright v. West,* 505 U.S. 277, 296 (1992)(citing *Jackson,* at 319). The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson,* at 326). "[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' ' *Id.* (quoting *Jackson,* at 326). For example the trier of fact is entitled to disbelieve a defendant's uncorroborated and confused testimony, and even to discount a defendant's credibility on account of a prior felony conviction. *Id.*

For the reasons detailed by the Ohio Court of Appeals, this Court likewise concludes that, when viewing all of the evidence in the light most favorable to the prosecution, *see Jackson v. Virginia, supra*, the evidence was constitutionally sufficient to sustain petitioner's convictions.

Claim three is without merit.

## CLAIM FOUR

In claim four, petitioner asserts that the trial court improperly imposed consecutive sentences without making proper findings.  Although he does not appear to have raised such claim in his initial habeas corpus petition, in his Traverse, petitioner also asserts that his sentence violates *Blakely v.*

28

*Washington*, 542 U.S. 296 (2004).  *See Traverse*.

Petitioner's claim that the trial court imposed consecutive sentences without making the findings required under Ohio sentencing statutes raises an issue regarding the alleged violation of state law which is not appropriate for federal habeas corpus relief.  A federal court may review a state prisoner's habeas petition only on the grounds that the challenged confinement is in violation of the Constitution, laws or treaties of the United States.  28 U.S.C. §2254(a).  A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law*." Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988).  A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure.  *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).  "'[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure'" in considering a habeas petition.  *Id*. (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)).  Only where the error resulted in the denial of fundamental fairness will habeas relief be granted.  *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988) .

Further, petitioner's *Blakely* claim is waived due to his failure to present this federal constitutional issue to the state courts.  In order to exhaust available state remedies, a petitioner must first fairly present the substance of his federal habeas corpus claims to the state courts.  *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Anderson v.Harless,* 459 U.S. 4, 6 (1982).  "The state courts must be provided with a fair opportunity to apply controlling legal principles to the facts bearing upon petitioner's constitutional claims." *Sampson v. Love,* 782 F.2d 53, 55 (6th Cir. 1986).  Petitioner does not fairly present his claim simply because the necessary facts supporting a federal constitutional claim are present or because the constitutional claim appears self evident. *Haggins v. Warden*, 715

F.2d 1050, 1054 (6th Cir. 1983)(citing *Harless*, 459 U.S. at 6).  Furthermore, "[a] petitioner 'fairly presents' his claim to the state courts by citing a provision of the Constitution, federal decisions employing constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns." *Levine v. Torvik,* 986 F.2d 1506, 1515 (6th Cir. 1993)(citing *Franklin v. Rose*, 811 F.2s 322, 326 (6th Cir. 1987)).  Courts normally require more than a single broad generalization that petitioner was denied a "fair trial" or "due process of law."  *Franklin*, 811 F.2d at 326; *Petrucelli v. Coombe*, 735 F.2d 684, 688 (6th Cir. 1984).  Petitioner, however, need not "cite book and verse on the federal constitution."  *Picard,* 404 U.S. at 277 (quoting *Daugharty v. Gladden*, 257 F.2d 750, 758 (9th Cir. 1960)).  The Sixth Circuit has strictly followed the requirement that petitioner fairly presented his federal constitutional claims to the state courts as a precondition to federal habeas review.  *Weaver v. Foltz*, 888 F.2d 1097, 1098 (6th Cir. 1989).

The record reflects that petitioner asserted in the state appellate court solely that the trial court had failed to comply with state law in imposing consecutive sentences.  *See Exhibit 11 to Return of Writ*.  Although the trial court initially sentenced him on February 22, 2005, long after the United States Supreme Court's June 24, 2004, *Blakely* decision, petitioner did not refer to *Blakely,* the United States Constitution, or to any state or federal cases in support of his claim that the trial court had improperly imposed consecutive sentences.  *See Exhibit 10 to Return of Writ*.  The state appellate court likewise addressed the claim in the context of state evidentiary law only:

> [A]ppellant claims that the trial court failed to make the required findings when it imposed consecutive sentences. However, the trial court recognized that consecutive sentences are necessary to protect the public from future offenses and to punish appellant. In addition, the trial court indicated that consecutive sentences are not disproportionate to the seriousness of the offenses. Furthermore, the trial court found that consecutive sentences are not disproportionate to the danger that appellant poses to the public. Lastly, upon analyzing

30

the multiple offenses that took place as part of a course of conduct, the trial court recognized that consecutive sentences are warranted because the harm caused by the offenses was so great or unusual that no single prison term would adequately reflect the seriousness of appellant's conduct. Thus, the trial court made the statutorily enumerated findings in R .C. 2929.14(E)(4).

Appellant also contends that the trial court failed to specify the requisite reasons to support its findings and that the evidence does not support consecutive sentences. However, as noted above, the trial court supported its decision to impose consecutive sentences by analyzing how appellant victimized four people in a brutal shooting, which involved one person being fatally shot "point blank" in the head and another person dying from a gunshot wound that severed his spine. Such evidence supports the trial court's R.C. 2929.14(E)(4) findings that: (1) consecutive sentences are necessary to punish appellant; (2) consecutive sentences are not disproportionate to the seriousness of appellant's conduct; and (3) the harm caused by appellant's multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of the courses of conduct would adequately reflect the seriousness of appellant's conduct.

By concluding that appellant is likely to commit similar offenses in the future, the trial court supported its R.C. 2929.14(E)(4) findings that consecutive sentences are necessary to protect the public from future crime and that consecutive sentences are not disproportionate to the danger that appellant poses to the public. The record supports the trial court's conclusions because appellant blamed others for his conduct when he stated that "the person who did these * * * is still out there[.]" (Tr. at 816.) Appellant's "failure to acknowledge and appreciate the seriousness of his crime demonstrates that [he] was likely to continue such activities, and consecutive sentences [are] necessary to protect the public from this future conduct." *Altalla* at ¶ 10; *Worrell* at ¶ 68.

Accordingly, we conclude that the trial court did not err by imposing consecutive sentences. As such, we overrule appellant's second assignment of error.

*State v. Wilson, supra*, 2006 WL 328689.  Further, petitioner has failed to establish cause for his

failure to present his federal constitutional issues to the state appellate court.  Petitioner, therefore,

31

has waived his right to present the federal constitutional issues presented in claim three for federal habeas corpus review.

For all of the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation* de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

s/Mark R. Abel
United States Magistrate Judge